COSMOPOLITAN BROADCASTING CORPORATION

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

American Civil Liberties Union of New Jersey, Appellant.

COSMOPOLITAN BROADCASTING CORPORATION, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

The Croatian National Congress et al., Bulgarian American League, Japanese American Assn. of New York, Inc., Federation of Lithuanian Women's Clubs, Congress of Portuguese People, Yugoslav Consolidated Benevolent Assn. and Iran Club, Intervenors.

COLUMBIAN LAWYERS ASSOCIATION, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee.

HUNGARIAN FREEDOM FIGHTERS FEDERATION, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee.

Nos. 76–2019, 76–2020, 76–2033 and 76–2034.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1977.

Decided May 31, 1978.

Harry M. Plotkin, with whom, Thomas Schattenfield, and David Tillotson, Washington, D. C., were on the brief for appellant Cosmopolitan Broadcasting Corp., case No. 76–2020.

Jeremiah S. Gutman, New York City, for appellant American Civil Liberties Union of New Jersey, case No. 76–2019.

Anthony S. Caronna, Brooklyn, N. Y., was on the brief for appellant Columbian Lawyers Association, case No. 76–2033.

Andras H. Pogany, South Orange, was on the brief for appellant Hungarian Freedom Fighters Federation, case No. 76–2034.

Gregory M. Christopher, Atty., Washington, D. C., for appellee F. C. C., case Nos. 76–2019, 76–2020, 76–2033 and 76–2034. Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel. J. Tullos Wells, and James H. Kizziar, Jr., Counsel, F. C. C., Washington, D. C., were on the brief, for appellee.

Valdas Guoba, East Northport, N. Y., was on the brief for intervenor Federation of Lithuanian Women's Clubs, case No. 76–2020.

Gerald Eisenberg, New York City, was on the brief for intervenor Iran Club, case No. 76–2020.

Jack Chadrjian, New York City, was on the brief for intervenor Bulgarian American League, case No. 76–2020.

George Yamaoka, New York City, was on the brief for intervenor The Japanese American Association of New York, Inc., case No. 76–2020.

Charles A. Giulini, New York City, was on the brief for intervenor Yugoslav Consolidated Benevolent Association, case No. 76–2020.

Dr. Branko M. Peselj, Washington, D. C., also entered an appearance for Intervenor The Croatian National Congress, et al., case No. 76–2020.

Before BAZELON, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion for the Court filed by BAZELON, Circuit Judge.

Concurring opinion filed by LEVENTHAL, Circuit Judge.

BAZELON, Circuit Judge:

Citing numerous technical violations and a virtual abandonment of licensee responsibility, the Federal Communications Commission (FCC) denied the 1969 application of Cosmopolitan Broadcasting Corporation for a renewal of its licenses to operate station WHBI (FM). Cosmopolitan appeals, arguing that the Commission's decision was arbitrary and capricious and not the product of the "reasoned decision making" required by *Columbia Broadcasting System, Inc. v. FCC,* 147 U.S.App.D.C. 175, 182–83, 454 F.2d 1018, 1025–26 (1971).

## I. BACKGROUND

Cosmopolitan has owned and operated station WHBI since it began broadcasting in 1962. Donald J. Lewis is the controlling stockholder of Cosmopolitan. He is the president, treasurer and director of the corporation, and effectively controls all the activities of WHBI. WHBI is licensed to serve Newark, New Jersey. Lewis had originally intended to develop WHBI as a black-oriented station. When this effort proved commercially unsuccessful, he moved WHBI into the field of foreign language and ethnic specialty programming. By 1969, 114 hours per week or 68% of WHBI's schedule[1] was devoted to ethnic programming broadcast in some 18 foreign languages.[2]

Virtually all of WHBI's ethnic programming, and a significant portion of its English language programming, is produced and presented by time brokers who pay Cosmopolitan a flat fee for the right to present programs on WHBI in specific time periods. The time brokers may sell commercials within these time periods for their own account, or they may re-sell the time to sub-brokers. Over 75% of WHBI's air time is sold to time brokers; approximately 20% of the remaining time is sold or given to persons or groups for religious broadcasts, with about 2 minutes per hour reserved by WHBI for station breaks and used mainly for public service announcements and commercial messages.

On February 26, 1969, Cosmopolitan applied for a renewal of its license to operate WHBI. The FCC, concerned with Cosmopolitan's control of its programming, deferred action on its application until further investigation. On December 19, 1972, the Commission issued a Notice of Apparent Liability designating Cosmopolitan's application for a hearing pursuant to section 309(e) of the Communications Act of 1934, 47 U.S.C. § 309(e). There were numerous

---

1. WMBI broadcasts continuously, 168 hours per week.

2. The following is a breakdown of WHBI's weekly foreign language programming in 1969: Spanish (45.5 hours); Italian (35.5 hours); Greek (10 hours); Hungarian (4 hours); Arabic (2.5 hours); Polish (2.75 hours); Brazilian (2.05 hours); Portuguese (2 hours); Lithuanian (1 hour); Slovakian (55 minutes); Croatian (.5 hours); Albanian (.5 hours); Ukranian (.5 hours); Roumanian (.5 hours); Armenian (.5 hours); Yugoslavian (.5 hours); Bulgarian (.5 hours); Norwegian (.5 hours). Reply brief for appellant, Appendix A at Exhibit # 6. By 1972, WHBI also broadcast in Korean, Macedonian, Urdu, Hindi, Bengali, Japanese, and Russian. WHBI, Exhibit # 6, Supplemental Joint Appendix (S.J.A.) at 31–58.

issues presented, the most important being whether Cosmopolitan had "exercised adequate control and supervision over the programming and other operation of Station WHBI consistent with licensee responsibility." [3] Joint Appendix (J.A.) at 2. Upon the motion of Cosmopolitan, an issue was added by the Commission's Review Board "to determine whether the programming of Station WHBI(FM) has been meritorious, particularly with regard to public service programs." 39 FCC 2d 698, 699 (1973).[4]

After a hearing before an Administrative Law Judge (ALJ) an initial decision was released on July 25, 1974. *Cosmopolitan Broadcasting Corp.*, FCC 74D–41, J.A. at 2–57. The ALJ resolved almost all of the substantive issues against Cosmopolitan.[5] He also refused to find "that the programming of station WHBI(FM) was particular-

---

3. Other issues designated for a hearing were:
   (a) To determine whether the applicant broadcast deceptive or misleading advertising.
   (b) To determine whether the licensee permitted a time broker to use the licensed facility in furtherance of a scheme to obtain monies from persons who were misled to believe they were being offered employment when, in fact, the purpose was to obtain purchases of a time broker's service, facilities, air time or course of instruction and training.
   (c) To determine whether the applicant failed timely to file with the Commission contracts relating to the resale of broadcast time in violation of Section 1.613(c) of the Commission's Rules.
   (d) To determine whether the applicant failed to make entries in the program logs of WHBI properly identifying the political affiliation of certain candidates for public office in violation of Section 73.282 of the Commission's Rules.
   (e) To determine whether applicant failed to maintain certain records and make them available for public inspection as required by Section 73.289(f) and 73.290(d) of the Commission's Rules.
   (f) To determine whether the rates charged for announcements broadcast by WHBI on behalf of candidates for political office exceeded that charged for announcements broadcast by WHBI for other candidates and other commercial advertisers and, if so, whether this practice violates the fairness doctrine or by engaging in that practice the licensee is otherwise not serving the public interest by discouraging candidates for political office from using the licensed facility.
   (g) To determine whether applicant failed to make proper entries in the program logs of WHBI containing information pertaining to foreign language programs in violation of Section 73.281(a) of the Commission's Rules.
   (h) To determine whether applicant has broadcast detailed pre-race information prior to horse racing events and, if so, whether such broadcasts were intended to be of aid to illegal gambling or might reasonably have been expected to be of such aid.
   (i) To determine whether applicant broadcast information sponsored by publishers of "scratch-sheets" or other publications disseminating detailed horse racing information by touts or other persons whose activities may result in aiding illegal gambling or furnishing information to illegal gamblers or bookmakers; and if other information was broadcast which may have resulted in aiding illegal gambling on events other than horse races.
   (j) To determine whether applicant broadcast an advertisement or information concerning a lottery in violation of Title 18 U.S.C. Section 1304 (1964).
   (k) To determine whether applicant failed timely to file ownership reports to the Commission in violation of [Section] 1.615 of the Commission's Rules.
   (*l*) To determine whether the licensee has substantially carried out its representations in its application for renewal in regard to the presentation of news by station WHBI.
   (m) To determine whether in the light of the evidence adduced under the foregoing issues, the licensee possesses the requisite qualifications to remain a licensee of the Commission.
   (n) To determine, in light of the evidence adduced pursuant to the foregoing issues, whether a grant of the captioned application would serve the public interest, convenience and necessity.
   S.J.A. at 2–4. The Commission also raised the issue of whether, in the event the hearing record did not warrant denial of Cosmopolitan's renewal application, a forfeiture of $10,000 or some lesser amount should be assessed against Cosmopolitan for broadcasts of lottery information which occurred within one year of the issuance of the Bill of Particulars served on Cosmopolitan pursuant to the Notice of Apparent Liability. *See* 18 U.S.C. § 1304.

4. Cosmopolitan had requested that a determination be made as to whether Cosmopolitan's programming was meritorious "particularly with regard to programs designed to serve the needs and tastes of ethnic minorities within the station's service area."

5. Cosmopolitan was found innocent of the infractions listed in issues "(h)" and "(i)." *See* note 3 *supra.*

ly meritorious." J.A. at 54. The ALJ held that the granting of Cosmopolitan's application for renewal of its license for WHBI(FM) "would not serve the public interest, convenience and necessity." *Id.* at 56. *See* 47 U.S.C. § 309(a). The Commission unanimously affirmed the ALJ's decision, 59 FCC 2d 558 (1976), concluding that Cosmopolitan "had operated its broadcast facility so as virtually to relinquish all interest and control over the station's programming to time brokers, religious broadcasters and commission salesmen." *Id.* at 560. In the FCC's view, the many violations found by the ALJ were a direct result of Cosmopolitan's abdication of licensee responsibility. *Id.* WHBI's programming did not "warrant any finding of special merit" because Cosmopolitan was not able to substantiate meritorious programming "from program logs submitted in evidence." *Id.* at 564.

Cosmopolitan filed a Petition for Reconsideration of the FCC's decision. In a Memorandum Opinion and Order released on Oct. 14, 1976, the Commission reaffirmed its earlier decision. 61 FCC 2d 257 (1976). Cosmopolitan appeals pursuant to 47 U.S.C. § 402(b).

## II. LICENSEE RESPONSIBILITY FOR PROGRAMMING AND OPERATIONS

At the heart of this case is the "longstanding bulwark of Commission policy" that "licensees have an affirmative, nondelegable duty to choose independently all programming for broadcast, in light of the tastes and ascertained needs and problems of the community." *Network Broadcasting by Standard (AM) and FM Broadcast Stations,* 63 FCC 2d 674, 690 (1977). In the Commission's view, Cosmopolitan has abdicated this duty by operating WHBI "primarily as a clearinghouse for the sale of program time for use or resale by others." Brief for appellee at 20.

The Commission contends that Cosmopolitan manifested its abdication of its duty in three ways. First, Cosmopolitan relinquished its non-delegable programming responsibility to time brokers and other purchasers of air time. Second, Cosmopolitan failed to maintain effective supervisory procedures to ensure familiarity with the content of WHBI's foreign language programming. Third, as a result of its abdication of control, Cosmopolitan permitted a significant number of violations of Commission rules to occur. Brief for appellee at 19–20.

### A. Failure to Retain Responsibility for Programming

■ A basic premise of Commission policy is that a licensee is a "trustee" for the public, and that he must therefore assume the "primary duty and privilege to select the material to be broadcast to his audience . . . ." *1960 Commission En Banc Programming Inquiry,* 44 FCC 2303, 2311–12 (1960). *See Yale Broadcasting Co. v. FCC,* 155 U.S.App.D.C. 390, 395–396, 478 F.2d 594, 599–600, *cert. denied,* 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973). "The Commission has always regarded the maintenance of control over programming as a most fundamental obligation of the licensee." *WCHS–AM–TV Corp.,* 8 FCC 2d 608, 609 (1967). The Commission has thus expressed strong disapproval of licensees who have relinquished control over portions of their programming through contractual arrangements, *Carol Music, Inc.,* 37 FCC 379, 380, 400 (1964), through excessive "plugging" into national network programming, *Allen T. Simmons,* 11 FCC 1160, 1173 (1947), *aff'd,* 83 App.D.C. 262, 169 F.2d 670, *cert. denied,* 335 U.S. 846, 69 S.Ct. 67, 93 L.Ed.2d 396 (1948),[6] or, most pertinently for appellant, through excessive time brokerage. *Metropolitan Broadcasting Corp.,* 8 FCC 557, 561–64, 570 (1941).

---

**6.** In *Simmons* the FCC rejected an application for a power increase and for a change in a station's frequency by a licensee who proposed merely to "plug" into the CBS network line during the hours of 8 a. m. to 11 p. m. The Commission stated that the "applicant's proposed program policy is . . . tantamount to a voluntary abdication to the network of the duty and responsibility of a broadcast station licensee to determine for itself the nature and character of a program service which will best meet the needs of listeners in its area . . . ." 11 FCC at 1173.

922

The Commission has defined a time broker as

one who buys time and then resells it to others. The time is the broker's to do with as he wishes and the risk is entirely the broker's since, if he cannot resell the time, he is still responsible for payment to the station of the agreed sum. Normally the broker has the entire responsibility for collection of money from the advertisers to whom he sells.

*United Broadcasting Co. of New York,* 4 RR 2d 167, 173 (1965). By engaging the services of time brokers a licensee may abdicate his own non-delegable duty to control the programming content of his station. For this reason the FCC has stated flatly that "any extensive time brokering . . may be contrary to the public interest," *In the Matter of Clarifying Paragraph (c) of Section 1.613,* 33 FCC 2d 653 (1972), and by regulation it has maintained a close scrutiny on time brokerage contracts.[7] *See Inquiry into Subscription Agreements Between Radio Broadcast Stations and Musical Format Service Companies,* 56 FCC 2d 805, 809 (1975).

In this case, it is beyond dispute that Cosmopolitan engaged in extensive time brokering. Approximately 75% of WHBI's air time was sold to time brokers. Cosmopolitan did not seek out these time brokers, nor did it involve itself in their day-to-day programming decisions. All of WHBI's foreign language broadcasts were time brokered, as was the English-language program "Kaleidoscope." Kaleidoscope was an early morning show broadcast between 3:00 a. m. and 6:00 a. m., Monday through Friday, and from 2:00 a. m. to 3:00 a. m. on weekends. The time broker for Kaleidoscope was, for all practical purposes, Dean

Lewis (no relation to Donald Lewis, the principal stockholder of Cosmopolitan). J.A. at 18. Dean Lewis resold Kaleidoscope's time in five minute segments to whoever would buy it; customers were attracted through advertisements promising them on-the-air "training" and the opportunity to produce and host their own radio programs. The ALJ found that Dean Lewis's customers "were allotted free reign as to the content of the programs which they prepared for broadcast. They were also free to make whatever sales they could of commercial time within the periods they would program." J.A. at 48. Donald Lewis had no contact with those who were broadcasting over the air during Kaleidoscope.

Based on this record, the Commission sustained the ALJ's conclusion that Cosmopolitan had failed to exercise adequate control and supervision over the programming of WHBI, stating that:

The primary reason for Cosmopolitan's lack of control and supervision over programming and operations is readily apparent: virtually every available minute of broadcast time on WHBI was sold to time brokers, who either provided programming or resold smaller blocks of time to subbrokers.

59 FCC 2d at 560. In its Memorandum Opinion and Order the Commission stated that "Cosmopolitan relinquished virtually all control over the station's programming to time brokers . . . ." 61 FCC 2d at 258.

Cosmopolitan, however, attacks this conclusion. It argues that Cosmopolitan did in fact maintain control over its programming by selecting time brokers and by specifying basic program formats and languages.[8]

7. During the period covered by Cosmopolitan's application for a license renewal, FCC regulations required licensees to file with the Commission "contracts relating to the sale of broadcast time to 'time brokers' for resale." 47 C.F.R. § 1.613(c) (1972). On November 8, 1972, the Commission altered its regulations and only required time brokerage contracts to "be kept at the station and made available for inspection upon request." *See* 47 C.F.R. § 1.613(d) (1976); 25 RR 2d 1719, 1722 (1972).

The change was made "[t]o reduce the administrative detail of the Commission . . . ." *Id.* at 1722.

8. Cosmopolitan claims that Donald Lewis meets with and explains to time brokers, orally and in writing, FCC rules and regulations. Cosmopolitan also states that Lewis makes concrete suggestions as to the basic format and general content of the proposed programs. By this Cosmopolitan means that Lewis agrees with time brokers about the languages in which

Cosmopolitan cites several FCC decisions for the proposition that the delegation of the day-to-day programming decisions is entirely consonant with Commission policy. *See Inquiry into Subscription Agreements Between Radio Broadcast Stations and Musical Format Service Companies,* 56 FCC 2d 805 (1975); *Stern Community Law Firm,* 34 FCC 2d 483 (1972); *Licensee Responsibility to Review Records Before Their Broadcast,* 31 FCC 2d 377 (1971). Cosmopolitan contends that the Commission was, contrary to its previous policy, in fact ruling against extensive time brokerage *per se.*

We think that Cosmopolitan's arguments fundamentally misconstrue the Commission's position. The Commission regarded Cosmopolitan's time brokerage as evidentiary of the legally dispositive question, which was whether Cosmopolitan had abdicated control over the programming of station WHBI. In concluding that this control had in fact been relinquished, the Commission specifically relied "on the *totality* of the licensee's *modus operandi.*" 61 FCC 2d at 258. This necessarily included the Commission's analysis of Donald Lewis's relationship to his time brokers,[9] and the fact that WHBI initiated virtually no programming of its own.[10] While it is true that "[l]icensee responsibility does not require . . . that the licensee . . . choose every record to be played on a particular program," *Stern Community Law Firm,* 34

FCC 2d 483, 484 (1972), nevertheless a "*responsible* public trustee" is "called upon to make thousands of programming judgments over his license term." *Licensee Responsibility to Review Records Before Their Broadcast,* 31 FCC 2d 377, 379 (1971). In all of the cases cited by appellant, the Commission forcefully reiterated its long-standing policy of requiring "broadcast licensees to be ultimately responsible for programming, regardless of the source." *Inquiry into Subscription Agreements Between Radio Broadcast Stations and Musical Format Service Companies,* 56 FCC 2d 805, 807 (1975). In this case the Commission concluded that Lewis's vague relationship to his time brokers' programming was insufficient to fulfill that responsibility. Although the Commission has permitted the delegation of some day-to-day programming chores, it has never intimated that a licensee can meet his responsibility to the public by merely choosing a general program format and the language in which it is to be broadcast. In this area of mixed legal and factual judgments, "we defer to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious or unreasonable." *West Michigan Telecasters, Inc. v. FCC,* 130 U.S.App.D.C. 39, 42, 396 F.2d 688, 691 (1968); cf. *NLRB v. Local Union No.*

their programs will be broadcast, the general ethnic orientation of their programs, and the fact that their programs will contain a mix of ethnic news and announcements. Within these basic parameters, Cosmopolitan concedes that time brokers have complete discretion as to program content.

9. *See* J.A. at 8–14, 42, 45–47; 59 FCC 2d at 561–62; 61 FCC 2d at 258; Brief for appellee at 6–7. Cosmopolitan brought the facts concerning Lewis's relationship to WHBI's time brokers to the attention of the Commission by way of exceptions to the ALJ's decision. *See* Exceptions 11, 12; J.A. at 78–80. The Commission denied these exceptions. 59 FCC 2d at 565.

Also relevant, of course, is Lewis's relationship to the subbrokers who bought time from the time brokers and produced much of the actual programming. In this connection, it is undisputed that Lewis had virtually no contact

with the subbrokers who broadcast on the Kaleidoscope program.

10. Most of WHBI's broadcast time that was not contracted out to time brokers was sold to religious groups who provided their own programming. Broadcast Bureau, Exhibit 1. Cosmopolitan strenuously points out in its brief that WHBI programmed two five minute daily news broadcasts (gathered from the Associated Press teletype), a daily 14 minute broadcast of racing information (also taken from the Associated Press teletype), three or four weekly 90 second editorials, and a weekly 14 minute interview program (that ran for approximately one year). Reply brief for appellant at 12. We note that Cosmopolitan brought these facts to the attention of the Commission, *see* Exception 5, and that the Commission ruled that they were "of no decisional significance." 59 FCC 2d at 565. We do not find this ruling to be arbitrary or capricious.

*103, International Ass'n of Bridge, Structural and Ornamental Iron Workers,* 434 U.S. 335, 98 S.Ct. 651, 656 n.7, 54 L.Ed.2d 586 (1978). Since the Commission's ruling is not arbitrary, capricious or unreasonable, and since it does not lack the "reasoned decision making" we required in *Columbia Broadcasting System, Inc. v. FCC,* 147 U.S. App.D.C. 175, 182, 454 F.2d 1018, 1025–26 (1971), we affirm it.

B. *Failure to Retain Familiarity with Programming*

■ A licensee cannot adequately fulfill his responsibility to maintain control over his programming unless he knows what is actually being broadcast over his station. Normally a station's engineer will monitor its broadcasts, but in the case of stations that broadcast in a variety of foreign languages retaining familiarity with the content of programming can often prove exceedingly difficult. For example, neither Donald Lewis nor any of WHBI's regular paid staff understands any of the languages broadcast over WHBI. Nevertheless, the Commission has refused to "carve out in this area a special exception to licensee responsibility":

> The desirability of foreign-language program service does not . . . relieve the broadcaster of his responsibility for his programming, which in turn necessarily depends upon his adoption of reasonable procedures for assuring himself

that the programming conforms to his policies and the requirements of the law.

*Licensee Responsibility To Exercise Adequate Control Over Foreign Language Programs,* 39 FCC 2d 1037, 1039 (1973) (*1973 Policy Statement*).

The Commission made this policy known as early as 1967, when it stated:

> Licensee responsibility requires that internal procedures be established and maintained to insure sufficient familiarity with the foreign languages to know what is being broadcast and whether it conforms to the station's policies and to requirements of the Commission's rules.
>
> Failure of licensees to establish and maintain such control over foreign language programming will raise serious questions as to whether the station's operation serves the public interest, convenience and necessity.[11]

*Public Notice re Foreign Language Programs,* 9 RR 2d 1901 (1967) (*1967 Policy Statement*).

Concerned with the *1967 Policy Statement,* Donald Lewis sent the Commission an unsolicited letter on October 25, 1967, describing the procedures he had instituted to monitor WHBI's foreign language broadcasts. S.J.A. at 6–10. Essentially, Lewis had hired multi-lingual monitors to listen, at random, to at least 15% of the station's foreign language programming.[12] The mon-

---

11. The Notice also stated that:

Essential to the exercise of proper licensee responsibility in this matter is knowledge of the content of such broadcasts. Commission inquiry reveals that a number of licensees have no familiarity with the foreign languages and, thus, no knowledge of the content of such broadcasts. They explain their practices as follows: (1) they permit only persons of established reputation for judgment and integrity to use their facilities; (2) copies of commercial announcements used on foreign language programs must be submitted in advance in English translation; (3) recordings of all programs are made and retained for future reference. We do not regard such procedures, in and of themselves, as sufficient to insure licensee knowledge of and control over foreign language programming.

*Id.*

12. Lewis stated in his letter that:

Cosmopolitan Broadcasting Corp. recognizes that licensee responsibility requires the implementation of procedures to insure sufficient familiarity with foreign languages so that the licensee will broadcast only material which conforms to the station's policies and to requirements of the Commission's Rules and Regulations. However, as the Commission realizes, the hiring of engineers familiar with all 16 languages broadcast by WHBI would be expensive, impractical, and probably impossible. The procedure WHBI has adopted to maintain knowledge of and control over foreign language programming is the hiring and utilization of monitors familiar with the various foreign languages broadcast by the station.

Station WHBI has hired a number of its regular listeners to monitor at least 15% of the foreign language programming on a formal

itors were given a memorandum describing "objectionable material which must be reported to the station at once." S.J.A. at 10. The memorandum contained explanations in lay language of obscenity,[13] personal attacks,[14] and exhortations to break the law.[15] In addition, the monitors were given

> written basis. Being regular listeners, far more than that 15% is monitored on an informal, nonwritten basis. Since the performers never know when they are being monitored, and since they may be eliminated from WHBI if they disregard station or Commission requirements, it thus behooves them to always comply. The monitors are paid for their services and certify to their expertise in the particular language involved.
> S.J.A. at 7.

13. The memorandum directed monitors to report "Any statement which is considered 'Dirty' (or bad word or words that polite people would never use). Any statement or word that has a 'double' meaning (both good and bad)." *Id.* at 10.

14. Monitors were asked to report:

> Any statement which seems to or does say bad or insulting things about someone, dead or alive. Any statement telling the public to hate a person, to criticize a person, or to make him look foolish. Any statement that says bad things about a person's job or business. Any statement which says a person is dishonest or of bad character. Any statement which says a person is immoral or indecent (perhaps relating to sex). Any statement which criticizes the way a person does his work (such as calling a doctor a "quack or butcher"). *Any statement in* which a person is called a criminal or accused of committing a crime (unless already proved guilty). Any statement which says bad things about a person, several people, a corporation, a product, or even a place or thing which would tend to hurt their reputation; such as saying they are dishonest and lacking in ability, or some such similar words.
> *Id.*

15. Monitors were alerted to report:

> Any statement which seems to or does tell people to break a law or to commit a crime. Any statement which tells people to organize and get together and do something illegal against another person, persons, or to damage their property. Any statement which tells people to act violently or harmfully . . or to tell people to riot.
> *Id.*

16. A copy of the report form was appended to the October 25 letter:

written forms to fill out describing each monitored program.[16] The form required the monitor to check if certain kinds of broadcasting were offered during the program (e. g., "news," "music," "sports," "political," etc.), to check the commercials broadcast for length and for sponsor's name

| | | | |
|---|---|---|---|
| Program: _____ | | Date: _____ | |
| Language: _____ | | Beginning Time: _____ | |
| | | Ending Time: _____ | |
| Routine Commercials | ____ | Religion | ____ |
| News | ____ | Sports | ____ |
| Social Notes | ____ | Interviews | ____ |
| Education | ____ | Political | ____ |
| Station Identification | ____ | Audience Requests | ____ |
| Music | ____ | Other: _____ | |

The undersigned certifies the accuracy of the content of the foregoing as broadcast over Radio Station WHBI at the time and date indicated.

I have examined the list of commercials (spot announcements) annexed hereto, and certify that the announcements actually made coincide with the list except:

I found no vulgarisms, profanity, double entendre, or matters of questionable taste, nor have I found any material which would be classed as objectionable in regard to slander, incitement to riot, defamation of character, or dishonest advertising, as contained in the memorandum supplied to me dated

Date: _____

Signed: _____

*Id.* at 8.

Monitors received a memorandum entitled "Explanation of Monitoring Forms & Procedures," which instructed them how to fill out their written reports. The Memorandum stated:

> Each monitor report will have marked on it by us the date and time of the program to be monitored with that sheet. Looking at that sheet, you can see the subjects which might be in a program. When listening, merely put a checkmark beside the kinds of subjects you heard. Also included will be a separate list of commercials for that program. To the right of each sponsor's name will be numerals indicating the estimated maximum length for each commercial. As you hear each commercial, please put a checkmark beside each sponsor's name. As for the timing or length, if it is as long as, or shorter than the indicated length, merely put a checkmark next to the correct numerals. That means it is okay. If it is longer than indicated, please tell us this on the monitor report. If you heard commercials that were not on that attached list, or if you heard them more times than listed (listed once but broadcast twice, for example) please also tell us that on the monitor report.

WHBI, Exhibit 25. This Memorandum was not sent to the Commission on October 25, but was included in a letter sent to the Commission by Cosmopolitan on April 19, 1968.

Monitors were paid $1.00 for each report filed.

against a prepared list, and to check for objectionable material and for dishonest advertising.

The Commission never acknowledged or responded to Lewis's letter. On February 20, 1968, the Commission sent Cosmopolitan a letter requesting, among other things, information concerning Cosmopolitan's compliance with the *1967 Policy Statement*. On April 19, 1968, Donald Lewis responded with a letter referencing the October 25 correspondence and including additional forms regarding the directions Cosmopolitan gave its monitors.[17] The Commission never responded to this letter.

In affirming the ALJ's decision, however, the Commission found that Cosmopolitan's monitoring system was inadequate because monitors failed to "evaluate substantive program content."[18] 59 FCC2d at 561. We affirm the Commission's finding. The purpose of the monitoring reports is to enable a licensee to retain sufficient familiarity with his broadcasts to exercise his responsibility as a public trustee. But this responsibility requires that a licensee be familiar with the actual content of his programming. The fairness doctrine, for example, requires that a licensee provide fair and accurate news reporting, *The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act*, 48 FCC2d 1, 21 (1974), that he make available a reasonable opportunity for the presentation of opposing viewpoints about controversial issues of public importance, *id.* at 10–17, and that he devote adequate broadcast time to the discussion of public issues, *id.* at 9–10. The limited information provided on Cosmopolitan's monitor reports[19] could not possibly have enabled Donald Lewis to know if his foreign language time brokers were fulfilling these obligations.

Cosmopolitan argues, however, that the Commission's lack of response to its October 25 and April 19 letters constituted an implicit endorsement of Cosmopolitan's monitoring system.[20] We disagree. The adequacy of Cosmopolitan's monitoring system could have been definitively assessed only in the context of WHBI's total method of operation. *See Wolfe Broadcasting Corp.*, 32 FCC2d 761, 763 (1971). Deficiencies in the monitor reports might have been remedied by supplementary connections between Lewis and his foreign language time brokers. When it became clear at Cosmopolitan's license renewal hearing that the monitor reports were virtually Lewis's sole source of knowledge concerning the day-to-day foreign language programming of WHBI, their deficiencies for the first time became fully manifest.

## C. *Other Violations*

■ The ALJ found that Cosmopolitan had violated numerous FCC regulations.[21]

---

17. *See* S.J.A. at 11–20; WHBI Exhibit 25; note 16 *supra.*

18. The Commission also stated that:

Cosmopolitan claims it pointed out certain prohibited practices—use of obscenity, slander and libel, violations of the fairness doctrine, and broadcast of lottery information—which it felt monitors should be aware of. Yet, by its own admission, it did not instruct prospective monitors in formal Commission requirements, opting instead for a "Memorandum," in English, containing a simplified summary of "objectionable material" which should be reported to the station. We believe the record amply supports the Judge's finding that " . . . evidently none of the monitors [had] direct knowledge of FCC Rules."

59 FCC2d at 561–62. Insofar as the Commission's point is that the simplified summary of "objectionable materials" was incomplete, omitting, for example, a thorough explanation of the fairness doctrine, we agree with the Commission's finding. We disapprove, however, the implication in the Commission's ruling that a licensee cannot translate FCC regulations into plain comprehensible English for its monitors.

19. *See* note 16 *supra.*

20. On January 9, 1969, the Commission granted Cosmopolitan's petition to relocate its main studio from its transmitter site to Riverside Drive in New York City. Cosmopolitan argues that this action also was an implicit ratification of its monitoring system.

21. *See* p. —— of 189 U.S.App.D.C., p. 921 of 581 F.2d and note 3 *supra.*

The Commission found these violations to be the result of Cosmopolitan's abdication of responsibility.

As a result of its abdication of licensee responsibility, numerous violations of Commission Rules occurred, including (but not limited to) the promotion of a lottery, false and misleading advertising, improper logging, failure to meet filing requirements, and inadequate record keeping. To quote [the ALJ], all this resulted from "a maximum resale of time and a minimum of control over how that time was actually used."

59 FCC2d at 560.

Cosmopolitan now attempts to characterize many of these violations as "inconsequential." Reply brief for appellant at 33. This argument fundamentally misconstrues the Commission's position, which is not that these violations were intrinsically serious, but that they were probative of an underlying abdication of licensee responsibility. *See Continental Broadcasting, Inc.,* 15 FCC2d 120, 129-31 (1968), *aff'd,* 142 U.S. App.D.C. 70, 439 F.2d 580 (1971).

Cosmopolitan also argues that two of the violations found by the ALJ are not supported by the record. First, Cosmopolitan finds error in the ALJ's ruling that WHBI failed to fulfill its promise in its 1969 license renewal application that it would broadcast 3 hours of news per week. Cosmopolitan claims to have broadcast 5 hours and 55 minutes of news per week, as evidenced by a composite week drawn from dates during the 1969–72 license term. Reply brief for appellant at 31–32. But Cosmopolitan admits that of this time only 47 minutes consisted of newscasts presented by WHBI's staff. Three hours and 40 minutes of the remaining time consisted of news produced by time brokers. This latter time cannot be counted as fulfilling Cosmopolitan's non-delegable duty to present news, since "[i]t is the licensee . . . who must select or be responsible for the selection of the particular news items to be reported or the particular local, State, na-

tional or international issues or questions of public interest to be considered . . .." *Editorializing by Broadcast Licensees,* 13 FCC 1246, 1247 (1949). In addition the ALJ concluded, and we see no reason to disagree, that the remainder of the programming Cosmopolitan designated as "news" was in fact tapes dealing with current developments made available by various State and public agencies, none of which "can be counted as news." J.A. at 53.

Second, Cosmopolitan argues that there is no evidence in the record, and that the ALJ's own findings of fact contradict his conclusion that rates charged to political candidates "in a few instances . . . exceeded normal commercial rates for similar time." J.A. at 51. The ALJ's findings of fact, however, disclose examples of time brokers charging a political candidate $17.50 per minute for announcements, while at the same time charging commercial advertisers between $5 and $17.50 per minute for comparable air time. J.A. at 32–33. The ALJ did state that:

> One explanation for the political charges was the fact that the time broker was paid not only for broadcast time but also for his services in preparing and announcing the copy for a political candidate. Nevertheless, there was no separation of charges between services and broadcast time.

J.A. at 51. Unfortunately, the ALJ did not support his conclusion by citations to the record, and neither did the Commission.[22] We cannot stress too strenuously the importance of such citations. *See Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 434, 541 F.2d 1, 62 (Bazelon, C. J., concurring), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Washington Gas Light Co. v. Baker,* 88 App.D.C. 115, 127, 188 F.2d 11, 23 (1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951); *cf. Aqua Slide 'N' Dive Corp. v. Consumer Product Safety Comm'n,* 569 F.2d 831, 837–38 (5th Cir. 1978); *Cooper Laboratories, Inc. v. Commissioner, FDA,* 163 U.S.App.D.C. 212, 227, 501 F.2d 772, 787

22. In fact, at *no point in* his decision did the ALJ support his factual conclusions by citations to the underlying record. The Commission referred to the record only fleetingly.

(1974). We cannot know in their absence precisely upon what evidence the Commission or the ALJ relied in reaching their factual conclusions. Thus we are left without guidance to scour the massive ten volume record in this case for ourselves, to speculate whether or to what extent, if any, the Commission relied upon and appropriately considered any evidence that we may unearth, and to evaluate this evidence without direction from the Commission. This procedure is both wasteful of judicial resources and inconsistent with the proper deference due the Commission. In this case, however, this wasteful procedure may be avoided because Cosmopolitan points to no evidence at all in support of its assertions. Reply brief for appellant, 29–31. Particularly in light of the Commission's prima facie demonstration of violations, Cosmopolitan must bear the burden of proof, 47 U.S. § 309(e), and we therefore support the Commission in this matter.

### III. THE MERIT OF WHBI'S PROGRAMMING

■ The FCC will at times permit the presentation of evidence as to the past programming of licensees in renewal proceedings involving character qualifications issues. "Such evidence is allowed on the theory that a meritorious program record may mitigate the significance of adverse findings under those issues." *Medford Broadcasters, Inc.,* 18 FCC2d 817, 818 (1969).[23] Of course, the addition of the meritorious programming issue does not foreclose the right of parties subsequently to argue as to the weight that should be accorded the evidence adduced. *Midwest Radio-Television, Inc.,* 18 FCC2d 1011, 1014 (1969).

At Cosmopolitan's request, an issue was added to its license renewal hearing "to determine whether the programming of Station WHBI(FM) has been meritorious, particularly with regard to public service programs."[24] At the hearing, Cosmopolitan produced testimony and affidavits from scholars like Dr. Margaret Mead, Dr. Mario Pei, and Dr. Gene Weltfish, to the effect that foreign language and ethnic programming was valuable to immigrants and to second and third generation members of ethnic groups. This evidence was for the most part based upon study of general descriptions of WHBI's programs.[25]

The ALJ resolved this issue against Cosmopolitan. On appeal the Commission noted that it had "no quarrel with the general proposition that ethnic programming serves an important purpose," but it stated that it could not conclude "that foreign language programming is *per se* meritorious . . . ." 61 FCC2d at 260. The Commission observed that "[w]hile Cosmopolitan alleges some programming responsive to the meritorious programming issue, it was not able to substantiate this claim from program logs submitted in evidence." 59 FCC2d at 564. Since Cosmopolitan's English language programming "was unresponsive to obligations imposed on a licensee" to serve the community of its license, 61 FCC2d at 261, the Commission upheld the ALJ.

Cosmopolitan attacks the Commission on several fronts. It argues, first, that the merit of WHBI's English language programming should not have been assessed in terms of WHBI's service to Newark, the city of its license. Cosmopolitan contends that it expressly stated in its 1966 license renewal application its intention of operating WHBI primarily as a foreign lan-

**23.** The Commission thus reviews the merits of programming only *after* a licensee has been found at a hearing to have been guilty of infractions of FCC regulations, and only as a factor that may mitigate the consequences of these infractions. In these circumstances the Commission's consideration of programming content is not likely to chill licensee programming decisions or to "threaten [a] licensee with cen-

sorship." *Citizens Committee To Save WEFM v. FCC,* 165 U.S.App.D.C. 185, 219, 506 F.2d 246, 280 (1974) (Bazelon, C. J., concurring in the result). We therefore see no fatal conflict with First Amendment values.

**24.** *See* note 4 *supra.*

**25.** *See* WHBI Exhibit 6, S.J.A. at 31–58.

guage/ethnic specialty station, serving ethnic minorities through the Newark-New York metropolitan area. *See* J.A. at 109–14. The Commission's approval of that application, Cosmopolitan argues, is inconsistent with its present evaluation of WHBI's English language programming.

We find Cosmopolitan's argument to be without merit. The issue before the Commission was whether "the programming" of WHBI had been meritorious, not merely whether its foreign language programming had been especially deserving. That the Commission had implicitly approved Cosmopolitan's plan to aim much of its programming at ethnic minorities throughout the New York and Newark metropolitan area did not exempt from the requirements of licensee responsibility the remainder of its programming. More than 30% of WHBI's programming was in English, and the Commission was surely entitled to evaluate this programming according to its customary standards.

Second, Cosmopolitan condemns as "arbitrary, capricious, [and] an abuse of discretion" the Commission's finding that WHBI's foreign language programming was without special merit. *See* 5 U.S.C. § 706(2)(A). Cosmopolitan contends that it presented substantial evidence concerning the meritorious content of its foreign language programming and that the Commission's requirement that the merit of WHBI's programming be demonstrated from program logs was irrational, since such logs would at most reflect that certain types of programming had been broadcast and "would have provided virtually no information as to the substantive content of the programs logged." Brief for appellants at 65 n.58. *See* 47 C.F.R. § 73.282 (1976).

We do not interpret the Commission's reference to program logs to constitute an implicit rule that no evidence other than program logs will be considered in the determination of program merit. With the guidance of appellee's brief, we construe the Commission's point to be that a licensee can receive special merit only if it offers, if not program logs, at least comparable "evidence of the 'substantive content' of its programming," brief for appellee at 44, and that Cosmopolitan had failed to offer such evidence. *Id.* at 42–44.

We agree with the Commission that program logs would provide evidence of the substantive content of the programs logged. Proper logging requires a licensee to classify its programs by content into, for example, news, entertainment, religious, instructional, political or editorial programs, *see* 47 C.F.R. § 73.282(b)(1)(iii) (1976), and thus provides the Commission precise, reliable evidence of the actual amount of broadcast time in each of these subject areas.[26] We assume, therefore, that by sustaining the ALJ's conclusion that WHBI's foreign language programming lacked special merit, the Commission was implicitly holding that Cosmopolitan had failed to produce evidence of comparably probative value.

If Cosmopolitan had in fact merely rested its case on the proposition that foreign language programming was meritorious *per se*, we would more easily tolerate such elliptical reasoning on the part of the Commission. But the Commission's brief manifestly misrepresents the record when it states that the record "shows that WHBI could present no evidence to support the 'merit' of its foreign language programming, other than the fact that since 1969 it sold air time to time brokers broadcasting in over twenty foreign languages." Brief for appellee at 44. Even putting aside the expert testimony offered by appellant concerning the value of foreign language programming, Cosmopolitan offered a great deal of evidence concerning the substantive content of

**26.** Cosmopolitan claims that in its 1966 license renewal application it explained to the Commission that these elements were so intermixed in its foreign language programs that they could not be separately logged. Brief for appellants at 65 n.58. We note, however, that FCC regulations permitted licensees to break down programs into "separately identifiable program units." *See* 47 C.F.R. § 73.282(a)(1)(ii) (1967).

WHBI's programming. This evidence ranged from the vague,[27] to the anecdotal,[28] to the very specific.[29] Some of the evidence offered by Cosmopolitan provided even more information than would be ascertainable from program logs. In Exhibit 54, for example, Cosmopolitan offered a "representative listing" of about 75 prominent guests interviewed on WHBI's foreign language programs, the appropriate date and duration of the interviews, and the principal topics discussed.[30]

The Commission's sibylline conclusion that Cosmopolitan had failed to demonstrate programming merit "from program logs" entirely ignores this evidence. We thus have no way of knowing whether the Commission even considered this evidence, much less its reasons for finding this evidence insufficient to establish the meritoriousness of WHBI's foreign language programming. Our function when reviewing the action of an administrative agency, however, is precisely "to assure that the

27. In its Exhibit # 6, S.J.A. at 31–58, Cosmopolitan provided an over-all description of its foreign language broadcasts. A representative sample is the discussion of the program *Happy Greek Morning*:

*Happy Greek Morning* (1968-present). This Greek language program is broadcast on Friday mornings between 8:00 and 9:00 a. m. The program's producer/performer, Demetrios Vassos, who received an education in law in Greece, presently operates a travel agency. "Happy Greek Morning" features Folk and classical Greek music, community news and information and public service messages. In 1972, Mr. Vassos added to his program approximately 6 minutes of news from Greece and around the world.

S.J.A. at 43.

28. Cosmopolitan introduced testimony by several time brokers describing the content of their respective programs. Some of this testimony was anecdotal in nature as, for example, when Ferenc Koreh, producer of a program entitled American Hungarian Voice, was asked whether the portion of his program devoted to community news and information was broadcast on a regular weekly basis:

A. It depends on when our community news is. It usually is on and I give some other information, all the other information that you cannot get from the American radio and newspapers.

Q. Could you give an example of the type of information that they could not get?

A. For example, it happened not long ago that some Hungarian tourists and Rumanians were touring the United States and Canada and I gave this information to the community.

But there are many such informations. The Hungarian Scouts in Exile are arranging an evening. They are not paying for this. This is a public service. It is an information because I am helping the community and the Scouts at the same time.

Transcript at 1453–54.

29. For example, Elfredo Rendiero, producer of a program entitled "The Voice of Portugal," testified that the content of his program consisted of "Music, news, interviews and items of interest to the Portuguese community":

Q. Is the music you play Portuguese music?

A. Portuguese and Brazilian music.

Q. And is the program broadcast in the Portuguese language?

A. Yes, sir.

Q. Do you broadcast a news program within the body of the program?

A. Yes, I do.

Q. And at what time is that broadcast?

A. 6:00 o'clock. There is one segment at 6:00, and there is another one at 5:30.

Q. The segment at 6:00 is how long?

A. Ten minutes.

Transcript at 1223–24. Mr. Rendiero's testimony was uncontradicted, and contained information of comparable specificity to that which could be obtained from program logs.

Again, I. K. Asghar, producer of a program entitled "Pakistani Hour" broadcast in the Urdu language, offered uncontradicted testimony concerning the substantive content of this program:

Q. In the exhibit we were just looking at, Exhibit 6, there's a news segment in the program. Can you tell us how much of your program prior to December, 1972, was devoted to the news of Pakistan?

A. First of all it depends very much on how many news items we have every week; sometimes we receive a number of items; then we give more time. But, let us say about five to seven minutes is normal, five to seven minutes; but sometimes it happens that the news is more; then we give more time; if the news were less, than it would be about five to seven minutes.

Transcript at 1869.

30. At the hearing, the Broadcast Bureau objected to Exhibit 54 on hearsay grounds, transcript at 2756, and the ALJ sustained the objection for reasons that are not entirely clear. When Cosmopolitan carried forward their exception to this ruling, Exception 71, the Commission ruled that it was "of no decisional significance." 59 FCC 2d at 567.

agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts, a course that tends to assure that the agency's policies effectuate general standards, applied without unreasonable discrimination." *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). Since on this record we cannot be assured that the Commission "has given reasoned consideration to all the material facts and issues," we cannot affirm its conclusion that WHBI's foreign language programming lacked special merit.

■ The issue of meritoriousness is of course for the Commission to determine in the exercise of its statutory authority. In such matters a "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). We therefore remand this case to the Commission for a more reasoned consideration of this question.

On remand the Commission will also have the opportunity to correct what has to date been a serious omission in its deliberations concerning the meritoriousness of WHBI's programming. The ultimate question to be determined by the Commission is whether the renewal of Cosmopolitan's license will serve "the public interest, convenience, and necessity." 47 U.S.C. § 309(a). We have long recognized, however, that "it is surely in the public interest, as that was conceived by a Congress representative of all the people, for all major aspects of contemporary culture to be accommodated by the commonly-owned public resources whenever that is technically and economically feasi-

ble." *Citizens Committee of Atlanta v. FCC*, 141 U.S.App.D.C. 109, 115, 436 F.2d 263, 269 (1970). For this reason we have held that "[t]here is a public interest in a diversity of broadcast entertainment formats."

The disappearance of a distinctive format may deprive a significant segment of the public of the benefits of radio, at least at their first-preference level. When faced with a proposed license assignment encompassing a format change, the FCC is obliged to determine whether the format to be lost is unique or otherwise serves a specialized audience that would feel its loss. If the endangered format is of this variety, then the FCC must affirmatively consider whether the public interest would be served by approving the proposed assignment . . . . .

*Citizens Committee to Save WEFM v. FCC*, 165 U.S.App.D.C. 185, 201, 506 F.2d 246, 262 (1974). We stated in *Citizens Committee to Save WEFM* that "the public interest implicated in a format change is the interest of the public in the service area, not just the city of license." *Id.*, 165 U.S.App.D.C. at 202, 506 F.2d at 263.

Although the issue in this case is not that of a format change, we believe that the reasoning of *Citizens Committee to Save WEFM* is applicable to the question of whether WHBI's programming deserves special merit. Meritorious programming, after all, is that programming which serves the public interest, convenience and necessity. In determining whether the past programming of WHBI may have mitigated its derelictions of character, the Commission should therefore consider whether denying Cosmopolitan's application for a license renewal will silence a unique outlet serving "a specialized audience that would feel its loss." [31]

---

31. The numerous intervenors in this case are evidence of the concern of members of ethnic language groups within WHBI's signal area at the loss of the outlet provided by WHBI. Intervenor briefs have been filed by the Iran Club, the Bulgarian American League, the Yugoslav Consolidated Benevolent Association, the Con-

gress of Portuguese People, the Japanese Association of New York, and the Federation of Lithuanian Women's Clubs. There have also been filed briefs for appellants Hungarian Freedom Fighters Association and Columbian Lawyers Association. These briefs strenuously ar-

■ There is some evidence of the uniqueness of Cosmopolitan's programming presently in the record. *See, e. g.,* transcript at 1864–65. In addition Cosmopolitan offered as evidence in Exhibit 33 a survey of the foreign language programming broadcast by other stations in its service area. The ALJ, however, refused to accept Exhibit 33, stating that "if the programming relied upon by WHBI is in fact by its nature meritorious, then it is in fact meritorious regardless of whether or not it is aired by any other station. If it is not meritorious, I do not think you can create merit in programming by reason of the fact that no other station carries that particular language." [32] Transcript at 2575. *See id.* at 2568–2579.[33] This ruling is wrong as a matter of law: where there is a likelihood that a license may not be renewed, determination of the meritoriousness of programming must include consideration of the uniqueness of that programming to a significant segment of the public.

On remand, we expect the Commission to give due regard to this consideration. We of course express no view as to whether consideration of this factor will affect the Commission's ultimate determination of the meritoriousness of WHBI's foreign language programming or as to whether, even if found meritorious, the seriousness of Cosmopolitan's other violations might be mitigated enough to deserve the imposition of a lesser sanction. *See SEC v. Chenery Corp.,* 318 U.S. 80, 93–95, 63 S.Ct. 454, 87 L.Ed.2d 626 (1943).

The case is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

LEVENTHAL, Circuit Judge, concurring:

I concur in the opinion of the court, and in its remand to the Commission for reconsideration and clarification of the issue of meritoriousness. I add a word only to note that options are open to the Commission on remand.

It is possible that the Commission will determine, on remand, that petitioner offers a unique and valuable service to foreign language listeners, but that this value does not sufficiently counterbalance petitioner's deficiencies, in failing to retain control of its programming, to warrant renewal of its license. Or the Commission may be of the view that this service, while valuable, can be provided by other potential licensees who would seek the license in a competitive hearing, and offer service without the identified deficiencies.

There are doubtless other options available to the Commission to achieve the continuation of foreign language services, if the Commission should determine that the public interest warrants their preservation.

■

---

gue the value of WHBI's programming to their respective ethnic communities.

32. There were some questions raised as to the competency of the evidence proffered by Cosmopolitan. Transcript at 2579. We intimate no view on this question.

33. Although Cosmopolitan did not carry forward its objection to the ALJ's ruling, it did present to the Commission an exception to the ALJ's finding that "[w]e can give Cosmopolitan some credit for its ethnic broadcasts but except

for variety, there is no other merit shown." In this exception Cosmopolitan argued to the Commission that "[b]y presenting programming in a multitude of foreign languages, *many of which are not available on any other radio station within WHBI's service* area, WHBI has been providing a valuable service to the members of numerous foreign language and ethnic groups, residing in Newark and the New York metropolitan area." Exception 100, Exceptions of Cosmopolitan Broadcasting Corp. to Initial Decision at 90 (emphasis added).